UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CROSS CHECK SERVICES, LLC,

Plaintiff,

v.

OLD REPUBLIC INSURANCE COMPANY, a Pennsylvania Corporation,

Defendant.

No. 2:15-cv-02113-MCE-EFB

**MEMORANDUM AND ORDER**

This matter arises out of Cross Check Services, LLC ("Cross Check" or "Plaintiff") and Old Republic Insurance Company's ("ORIC" or "Defendant") cross Motions for Summary Judgment. ECF Nos. 24, 25. The motions have been fully briefed. For the reasons set forth below, Plaintiff's motion (ECF No. 25) is DENIED, and Defendant's motion (ECF No. 24) is thus GRANTED.[1]

///

///

///

///

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

1

# BACKGROUND[2]

### A. Factual Background

The Nevada Fire Safe Council ("NVFSC") was a non-profit corporation formed under the laws of the State of Nevada. According to its bylaws, its purpose was to "work on solutions to reduce the loss of lives and property from the threat of fire in Nevada and Tahoe Basin communities." ECF No. 24-3 ¶ 2. Among other things, NVFSC applied for grants for fuel reduction efforts and other activities related to the reduction of forest fires. Id. ¶ 3. On February 5, 2009, the United States Department of Agriculture (Forest Service) ("Forest Service") granted $6,234,000 in support of the Lake Tahoe Basin Multi-Jurisdictional Fuel Reduction and Wildfire Prevention Strategy (the "Forest Service Grant"). Id. ¶ 4. The Forest Service grant letter stated that funds would be paid to NVFSC only for approved project activities, and only in response to a request for an advance or reimbursement. Id. ¶ 5.

In late 2010, the City of South Lake Tahoe ("City"), through a posting by NVFSC, sought bids for the Lake Christopher Fuel Reduction Project (the "Lake Christopher Project" or "Project") on lands owned by the City as well as other local entities. Id. ¶ 6. On or about December 23, 2010, Cross Check—a California LLC that conducts forest reduction activities throughout the greater Lake Tahoe Basin—submitted a bid to the City to perform the fuel reduction work on the Lake Christopher Project. Id. ¶¶ 1, 7. On or about January 25, 2011, the City Fire Department notified Cross Check that it was the successful bidder on the Lake Christopher Project, and thereafter, NVFSC issued a series of "Purchase Orders," under which Cross Check would perform. ECF No. 24-3 ¶¶ 8, 9.

///

---

[2] This case presents almost purely legal issues, and as such, the facts for the most part are undisputed. See Joint Statement of Stipulated Facts, ECF No. 24-3; Defendant's Response to Plaintiff's Statement of Additional Undisputed Material Facts ("UMF"), ECF No. 31-1. Unless otherwise noted, this background is taken, sometimes verbatim, from these documents.

2

Pursuant to its accepted bid, Cross Check agreed to perform fuel reduction work in exchange for $174,240. ECF No. 24-3 ¶ 9. NVFSC issued a total of three Purchase Orders to Cross Check concerning the Project; each of these Purchase Orders listed the funding source as the Forest Service Grant. Id. ¶¶ 9, 10, 11. Additionally, the second page of each Purchase Order, which was initialed on behalf of Cross Check, contained various contract provisions, including an arbitration clause:

> 2. Dispute Resolution: Arbitration – prevailing party receives fees and costs. Mindful of the high cost of litigation, not only in dollars, but also in time and energy, the parties intend to and do hereby establish the following out-of-court alternate dispute resolution procedure to be followed <u>in the event any controversy or dispute should arise out of, or relating to this contract or relating to any change orders or other changes or addendums to this contract. If a dispute develops between the parties to this contract, the parties will submit to binding arbitration to address any controversy or claim arising out of, or relating to this contract or relating to any change orders or other changes or addendums to this contract</u>. . . . The Arbitration Award shall be binding upon the parties and shall be enforceable in any court of competent jurisdiction . . . .

ECF No. 24-3 ¶ 12 (emphasis added).

While the parties originally intended for the Project to start in January 2011, it instead began in April 2011 because the City did not obtain the requisite permits before that time. Id. ¶ 15. In mid-April, Cross Check began cutting material to be removed from the Project area, and by the end of that month, realized that the weight of the now water-saturated debris was heavier than if the project had started on-time. Id. ¶ 16. By the end of April, Cross Check determined that the cost to perform the Project was going to be higher than expected; indeed, it incurred cost overruns totaling $169,844. Id. ¶¶ 17, 18, 23. Despite these cost overruns, Cross Check was nevertheless required to continue removing all materials that had been cut down due to multiple state and local regulations. Id. ¶¶ 19, 20.

///

///

///

Upon being notified of the anticipated cost overruns, the Project Manager for the Lake Christopher Project[3] advised Cross Check that he was "approving" the additional funding, and that he would do his best to ensure payment, despite believing that additional payments were not required based on the Purchase Orders. ECF No. 24-3 ¶¶ 11, 24, 25.

Cross Check completed the Project and submitted its cost-overage invoice on June 2, 2011 in the amount of $169,844, which the Project Manager approved and sent to NVFSC for payment. Id. ¶ 25. NVFSC's Executive Director first learned that Cross Check was seeking an additional payment for the Project only after the June 2, 2011 invoice was received, and due to the invoice amount, it required approval by NVFSC's Board of Directors (the "Board"). Id. ¶¶ 26, 28. In June 2011, the Board declined to pay Cross Check's June 2, 2011 invoice, despite there being available grant funds to do so. ECF No. 24-3 ¶¶ 29, 30. As a result, Cross Check demanded arbitration pursuant to the Purchase Order's arbitration clause to resolve its dispute against the City and NVFSC. ECF No. 24-3 ¶¶ 36, 37.

### 1. Insurance Policy

ORIC issued a nonprofit organization and management liability insurance policy to NVFSC for the period January 9, 2011 to January 9, 2012 ("the Policy"). ECF No. 24-3 ¶ 31; ECF No. 31-1, UMF No. 1. Under the Policy's Insuring Agreement C for Organizational Liability, the applicable coverage provided, in part, that:

> The Insurer [ORIC] will pay on behalf of the Organization [NVFSC] any Loss for which the Organization has become legally obligated to pay as a result of a Claim first made during the Policy Period or Extended Reporting Period, if applicable, against the Organization for a Wrongful Act taking place prior to the end of the Policy Period.

ECF No. 31-1, UMF No. 3 (emphasis added). The Policy defined "Loss" in relevant part as "damages, judgments (including pre/post-judgment interest on a covered judgment),

---
[3] Ray Zachau, who served as the Fire Marshall for the City, was the designated Project Manager of the Lake Christopher Project. ECF No. 24-3 ¶ 9.

4

settlements and Defense Costs which the Insureds become legally obligated to pay . . ."
ECF No. 31-1, UMF No. 6. "Claim" included "a written demand for monetary relief, and a civil or arbitration proceeding against an Insured (defined to include the Organization) for monetary, nonmonetary or injunctive relief." ECF No. 31-1, UMF No. 4. "Wrongful Act" included in part "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act . . . , with respect to Insuring Agreement C, by the Organization." ECF No. 31-1, UMF No. 5. The Policy further provided that ORIC, "shall have the right and duty to defend any Claim covered by this Policy, even if any of the allegations in such Claim are groundless, false or fraudulent." ECF No. 31-1, UMF No. 9.

In addition to the aforementioned terms, the Policy included an exclusion clause (the "Exclusion Clause") concerning claims against NVFSC as a result of contractual disputes. The Exclusion Clause provided, in relevant part, that:

> The Insurer shall not be liable under Insuring Agreement C to make payment for Loss as a result of a Claim made against an Organization: [¶] 1. For any actual or alleged obligation under or breach of any oral or written contract or agreement, including any liability of others assumed by the Organization under any such contract or agreement; provided, however, the exclusion shall not apply (i) to an actual or alleged breach of an implied contract in an Employment Claim, or (ii) to the extent the Organization would have been liable for such Loss in the absence of such contract or agreement . . . .

UMF No. 10.

**2. Arbitration Action**

At Cross Check's demand, arbitration between the parties began after NVFSC's refusal to pay the June 2, 2011 invoice (the "Underlying Action"). ECF No. 24-3 ¶¶ 36, 37. Cross Check's Notice of Claim in the Underlying Action included allegations that beginning in February 2011, Cross Check entered into a series of contracts—i.e., the Purchase Orders—to conduct fuel reduction services for the Project. ECF No. 24-3 ¶ 32. On October 6, 2011, an email chain was sent to an ORIC Claims Representative detailing Cross Check's claims, as described by a NVFSC representative. Ex. 62, ECF

No. 24-66, JTE 0520–21. NVFSC's claim description, dated September 29, 2011, included, in part, that:

> Dave Mercer, owner of Crosscheck Services . . . contracted with [NVFSC] to provide fuels reduction services on what is known as the Lake Christopher Project. Three purchase orders were issued to complete this work . . . [¶] . . . . After all work had been completed Mr. Mercer submitted an invoice for approximately $172,000.00 above and beyond the Not to Exceed amounts listed [in the Purchase Orders]. [NVFSC] had no knowledge that Mr. Mercer continued to work after he had realized the costs covered by his signed purchase orders. [¶] [The NVFSC Board] denied Mr. Mercer's request for the additional payment. Last week, Mr. Mercer requested that [NVFSC] begin the process of Dispute Resolution as specified in Item #2 on the rear of the purchase order . . . . That is the current status of the situation. [¶] [NVFSC] is requesting that you review this situation for possible coverage under one of our policies issued by your firm.

Ex. 62, ECF No. 24-66, JTE 0520–21. By a letter dated October 18, 2011, ORIC declined to provide a defense and/or indemnify NVFSC with respect to Cross Check's claim and cited the Exclusion Clause as the basis for this denial. ECF No. 24-3 ¶ 34; ECF No. 31-1, UMF No. 23.

In the Underlying Action, the City was granted summary judgment on August 27, 2012 on the basis that the Project Manager had no authority to contract on behalf of the City; a hearing was conducted on October 4, 2012 between Cross Check and NVFSC concerning the remaining claims. ECF No. 24-3 ¶¶ 38; Ex. 49, ECF No. 24-53, JTE 0361. On October 8, 2012, the arbitrator issued an interim award in favor of Cross Check in the sum of $169,844, as well as simple interest at the rate of 10% from the date of June 22, 2011. Ex. 49, ECF No. 24-53, JTE 0364. In making his decision, the arbitrator provided, in part, that:

> At the time that [NVFSC] rejected Cross Check's request for payment, [the City] was urging payment to Cross Check. At that time, more than $1 million in allocated grant funds were available for payment for projects in the South Lake Tahoe Division. [NVFSC] abused its discretion in disregarding the City's request for payment of Cross Check by re-allocating grant funds within that Division . . . [¶] . . . It is the law where a public entity represents to a private contractor-bidder that certain conditions of the work exist, and during the job more

> onerous conditions are encountered, causing the contractor extra work, the contractor is entitled to payment for the extra work. (See generally, Los Angeles Unified School Dict. v. Great American Ins. Co. (2010) 49 Cal. 4th 739, 753-754.) Here, it was represented to Cross Check that the work would begin in January. Implicit in that representation was the representation that the work would begin in the dormant period of the forest, when the weight of the vegetation would be minimal. When commencement of the work was delayed until April, Cross Check encountered a changed condition (double the weight of the vegetation) that caused it extra work for which it is entitled to payment. [¶] The reasonable value of Cross Check's extra work is $169,844.00.

Ex. 49, ECF No. 24-53, JTE 0363–64.

### A. Procedural Background

In 2012, NVFSC filed for bankruptcy in the United States Bankruptcy Court, District of Nevada. ECF No. 24-3 ¶ 45. On January 10, 2013, Cross Check filed a proof of claim in the bankruptcy proceeding, seeking a total of $249,954.52, comprised of: $169,844 for breach of contract; $24,150.02 for interest on that amount at the rate of 10 percent from June 10, 2011 to November 18, 2012; $39,342.50 for attorneys' fees; $1,521 for recoverable costs; and $15,097 for JAMS fees. ECF No. 24-3 ¶ 45. On November 21, 2012 Cross Check demanded payment from ORIC for all amounts due, contending that NVFSC's "Loss" was covered pursuant to the Policy on account of the loss being predicated by a "Wrongful Act." ECF No. 24-3 ¶ 46.

On August 5, 2013, Cross Check filed a Petition to Confirm Contractual Arbitration Award in the California Superior Court, El Dorado County, including interest at the statutory rate, and on October 8, 2013 the Petition was granted. ECF No. 24-3 ¶¶ 43, 44. Judgment was entered in Cross Check's favor and against NVFSC for $169,884, plus interest on that amount at the rate of 10 percent from June 22, 2011, and the sum of $55,960.50, plus interest on that amount at the rate of 10 percent from October 8, 2012. ECF No. 24-3 ¶ 44. On August 28, 2015, the bankruptcy court approved an assignment of rights agreement between NVFSC and Cross Check, such that any of NVFSC's claims under the Policy were assigned to Cross Check. Id. ¶ 47. Cross Check then initiated the present action against ORIC on October 8, 2015. ECF No. 1.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

8

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

///

///

///

**ANALYSIS**

In its motion for summary judgment, ORIC argues that it had neither the duty to defend NVFSC in the Underlying Action, nor the duty to indemnify the resulting "Loss," on grounds that: (1) NVFSC's obligation to pay the June 2, 2011 invoice preceded its alleged "Wrongful Act" in refusing to authorize payment of the invoice, such that the refusal to pay cannot be considered an insurable "fortuitous" event; and (2) NVFSC's loss arising from the Underlying Action nevertheless fell within the Policy's Exclusion Clause. Def's Mot., ECF No. 24, at 7:23–10:20. Cross Check, in turn, claims that: (1) ORIC had the duty to defend NVFSC in the Underlying Action because on the date it denied coverage, ORIC had failed to thoroughly investigate whether Cross Check's claims were covered by the Policy; and (2) Cross Check's arbitration award did not arise "as a result of" a contract with NVFSC, but instead arose from a "Wrongful Act," namely, the Board's abuse of discretion in not heeding the City's request to authorize payment of Cross Check's June 2, 2011 invoice. Pl's Mot., ECF No. 25, at 9:16–13:6, 15:1–17:25.

Per the Policy's Exclusion Clause, if the Underlying Action or "Loss" resulting therefrom incurred "as a result of" any actual or alleged contractual obligations that NVFSC had with Cross Check, then ORIC would have had no duty to indemnify NVFSC's Loss. As the duty to defend is broader than the duty to indemnify, the Court first turns to the question of whether ORIC had a duty to defend NVFSC in the Underlying Action. As the Court finds that ORIC had no duty to defend NVFSC in that action, so too does the Court find no duty to indemnify.

**A.  ORIC's Duty to Defend**

Under California law, an insurer's duty to defend is broader than the duty to indemnify, and an insurer must defend a suit which potentially seeks damages within the coverage of the policy. Anthem Elecs., Inc. v. Pac. Emplrs. Ins. Co., 302 F.3d 1049, 1054 (9th Cir. 2002); Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993). "Because the insurer's duty to defend is broader than the duty to indemnify, a conclusion

10

that" the insurer did not owe a duty to defend will be dispositive of a claim that the insurer had a duty to indemnify. Delgado v. Interinsurance Exch. of Auto. Club of S. Cal., 47 Cal. 4th 302, 308 n.1 (2009) (citations omitted).

"In resolving the question of whether a duty to defend exists—tendered in the context of a summary adjudication/summary judgment motion in a declaratory relief action—the insurer has a higher burden than the insured." Am. States Ins. Co. v. Progressive Cas. Ins. Co., 180 Cal. App. 4th 18, 27 (2009). While the insured "need only show that the underlying claim may fall within policy coverage," the insurer "must present undisputed facts that eliminate any possibility of coverage." Id. (emphasis in the original). Thus, under California law, the duty to defend "may exist even where coverage is in doubt and ultimately does not develop." Saylin v. Cal. Ins. Guarantee Ass'n, 179 Cal. App. 3d 256, 263 (1986). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." Horace Mann Ins. Co., 4 Cal. 4th at 1081.

"Whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy and extrinsic facts known by the insurer at the inception of the third-party lawsuit." Palp, Inc. v. Williamsburg Nat'l Ins. Co., 200 Cal. App. 4th 282, 289 (2011) (internal citations and quotation marks omitted) (emphasis in the original). "[T]he duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party." Barnett v. Fireman's Fund Ins. Co., 90 Cal. App. 4th 500, 510 (2001). In addition, "facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." Horace Mann Ins. Co., 4 Cal. 4th at 1081.

While the duty to defend is broad, an insurer "will not be compelled to defend its insured when the potential for liability is . . . tenuous and farfetched." Lassen Canyon Nursery v. Royal Ins. Co., 720 F.2d 1016, 1018 (9th Cir. 1983) (citation omitted). In other words, the duty to defend does not require an insurer to undertake a defense as to claims that are "factually and legally untethered from the third-party's complaint."

Storek v. Fld. & Guar. Ins. Underwriters, Inc., 504 F. Supp. 2d 803, 812 (N.D. Cal. 2007). Thus, "[t]he insurer's defense duty is obviated where the facts are undisputed and conclusively eliminate the potential the policy provides coverage for the third-party's claim." Palp, 200 Cal. App. 4th at 289; see also We Do Graphics, Inc. v. Mercury Cas. Co., 124 Cal. App. 4th 131, 136 (2004) ("If, at the time of tender, the allegations of the complaint together with extrinsic facts available to the insurer demonstrate no potential for coverage, the carrier may properly deny a defense."). "An insurer is entitled to summary judgment that no potential for indemnity exists if the evidence establishes no coverage under the policy as a matter of law." Palp, 200 Cal. App. 4th at 289.

Here, the Policy had a clear and unambiguous Exclusion Clause barring coverage for any loss "as a result of" a claim "for any actual or alleged obligation under . . . any oral or written contract or agreement." ECF No. 31-1, UMF No. 10. Yet, as Plaintiff correctly contends, the Court's inquiry begins with an assessment of ORIC's knowledge of Cross Check's claims against NVFSC as of October 18, 2011, the date ORIC declined to provide a defense and/or indemnify NVFSC in the Underlying Action. See CNA Cas. of Cal. v. Seaboard Sur. Co., 176 Cal. App. 3d 598, 610 (1986) ("The duty to defend cannot be adjudged on the basis of hindsight. It must be determined from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense."); see also ECF No. 24-3 ¶ 34; ECF No. 31-1, UMF No. 23.

All information available to ORIC about the Cross Check's claim was submitted in this proceeding as Exhibit 62 ("Claims File"). ECF No. 24-3 ¶ 34. The Claims File shows that ORIC received a Claim Notice via email on July 22, 2011 articulating potential legal action by a third-party non-winning bidder on account that the Board "did not follow the Fair Bid Process in awarding the [Lake Christopher Project] contract" to Cross Check. Ex. 62, ECF No. 24-66, at JTE 0533. The Claim Notice articulated other potential liabilities related to NVFSC's annual audits and cash management compliance issues regarding federal grants. Id. at JTE 0534.

In a subsequent letter dated July 25, 2011, ORIC acknowledged to NVFSC receipt of the Claim Notice; the "CLAIMANT" in this letter was listed as an "UNKNOWN CONTRACT BIDDER." Ex. 62, ECF No. 24-66, at JTE 0526–28. On September 29, 2011, ORIC received notice of Cross Check's request to go to binding arbitration with NVFSC "regarding [Cross Check's] cost overrun on the Lake Christopher Project." Id. at JTE 0522. On October 6, 2011, ORIC was provided NVFSC's description of Cross Check's arbitration claims, which included, in part, that Cross Check "contracted with [NVFSC] to provide fuel[ ] reduction services on what is known as the Lake Christopher Project. Three purchase order[s] were issued to complete this work . . . . After all work had been completed [Cross Check] submitted an invoice for approximately $172,000.00 above and beyond the Not To Exceed amounts . . . . [the Board] denied [Cross Check's] request for additional payment. Last week [Cross Check] requested that [NVFSC] begin the process of Dispute Resolution as specified in Item #2 on the rear of the purchase order . . . ." Id. at JTE 0520–21. ORIC's denial of defense letter was sent thereafter.

From a review of the Claim File, the Court finds that ORIC had sufficient knowledge of Cross Check's claims against NVFSC by October 18, 2011 to determine that these claims fell within the Exclusion Clause of the Policy. The July 22, 2011 Claim Notice detailed potential challenges to the fair bidding process for the Lake Christopher Project; such claims, if materialized, arguably may not have arisen outside of NVFSC's actual or alleged contractual obligations, and therefore may also have not fallen outside the Policy's Exclusion Clause. However, by the time that ORIC received notice of Cross Check's actual arbitration claims, the only remaining issues concerned cost overruns on the Lake Christopher Project Purchase Orders. It is undisputed that the three Purchase Orders set forth the scope of Cross Check's contractual obligation to perform regarding the Project. ECF No. 24-3 ¶ 14. That Cross Check encountered cost overruns, and sought payment for these increased costs, does not bring its claims for payment outside the purview of these underlying contracts. Indeed, the Underlying Action ensued after Cross Check's demand pursuant to the arbitration clause within these very contracts.

13

1  NVFSC's own description of Cross Check's arbitration claims would have led any
2  reasonable insurer to conclude that these claims were related to "actual or alleged"
3  obligations under an "oral or written contract or agreement."  ECF No. 31-1, UMF No. 10.
4    The events occurring after ORIC's October 18, 2011 denial of coverage support
5  that its assessment of Cross Check's claims in the Underlying Action were correct.
6  These undisputed facts include, in part, that: Cross Check's asserted claims in the
7  arbitration related to breach of contract (Ex. 48, Pl's Arbitration Brief, ECF No. 24-52;
8  ECF No. 24-3 ¶ 32); in finding for Cross Check in the Interim Award, the arbitrator cited
9  Los Angeles Unified School Dict. v. Great American Ins. Co., 49 Cal.4th 739, 753–54
10 (2010) as the basis for his decision, which concerned contractual issues in the public-
11 entity, private-contractor-bidder cost overrun context (Ex. 62, ECF No. 24-66, JTE 0520–
12 21); and Cross Check's proof of claim in NVFSC's bankruptcy proceeding related to
13 monies owed for "breach of contract" (ECF No. 24-3 ¶ 45).  While these
14 post-October 18, 2011 facts cannot be used in hindsight to justify ORIC's denial of
15 coverage, they nonetheless support that Cross Check's claims have been treated as
16 contractual in nature for the entirety of this dispute.
17   Defendant has met its burden in proving that Underlying Action arose as a result
18 of a contract between NVFSC and Cross Check.  The factual record supports that when
19 ORIC made its October 18, 2011 decision to not defend NVFSC in the Underlying
20 Action, it had enough factual knowledge to determine that Cross Check's claims were
21 related to NVFSC's actual or alleged contractual obligations under the Purchase Orders.
22 Having successfully shifted its burden, the Court finds that Cross Check failed to carry it,
23 such that it did not show that the Underlying Action concerned anything other than
24 claims arising from of a contractual dispute.  Accordingly, Plaintiff's motion is DENIED,
25 and Defendant's is GRANTED on that basis.
26 ///
27 ///
28 ///

### B. ORIC's Duty to Indemnify

As discussed above, because an insurer's duty to defend is broader than the duty to indemnify, this Court's determination that, per the Policy's Exclusion Clause, ORIC had no duty to defend NVFSC in the Underlying Action likewise bars Cross Check's claim concerning ORIC's indemnity of NVFSC for the losses arising from that action. Anthem Elecs., Inc., 302 F.3d at 1054. Accordingly, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED.

## CONCLUSION

For the reasons set forth above, the Court concludes that there exists no genuine issue as to any material fact. Cross Check has not established that NVFSC's loss arising from the Underlying Action occurred as a result of anything other than a contractual obligation to Cross Check. Cross Check's Motion for Summary Judgment (ECF No. 25) is DENIED on that basis. For its part, however, ORIC is entitled to judgment as a matter of law on the basis that the Underlying Action arose as of a result of the Purchase Order contracts, such that they fell within the purview of the Policy's Exclusion Clause. ORIC's Motion for Summary Judgment (ECF No. 24) is accordingly GRANTED, and judgment shall be entered in its favor. Having determined that summary judgment is appropriate on the Policy's Exclusion Clause issue alone, the Court need not rule on the remainder of the Parties' arguments, as set forth in their motions, and declines to do so.

This matter having now been concluded in its entirety, the Clerk of Court is directed to close the file.

IT IS SO ORDERED.

DATED: March 29, 2019

MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE